IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KUWAIT PEARLS CATERING COMPANY, §
WLL,                             §
                                 §
            Plaintiff,           §
                                 §
VS.                              §      Civ. A. H-15-0754
                                 §
KELLOGG BROWN & ROOT SERVICES,   §
INC.,                            §
                                 §
            Defendant.           §

## OPINION AND ORDER OF DISMISSAL

The above referenced cause alleges, purportedly under

Texas state law, (1) breach of a subcontract[1] for Defendant Kellogg

---

[1] The United States as sovereign may contract for the property or services it needs; that contracting is known as procurement or acquisition. *See, e.g., In re American Boiler Works*, 220 F.2d 319, 321 (3d Cir. 1955)("In the absence of constitutional inhibitions the sovereign can make such contract as it pleases and no one can object."); *Shepard Engineering Co. v. United States*, 289 F.2d 681, 682 (8th Cir. 1961). The main purpose of a government procurement contract is to acquire services or property for the direct benefit of the United States Government. The key regulation governing federal procurement is the Federal Acquisition Regulation ("FAR"), effective as of April 1, 1984, which is published in the Federal Register and Title 48, of the Code of Federal Regulations. *See generally*, 1 West's Fed. Admin. Prac. § 601 (database updated July 2015).

Under the first subcontract KBR had with KPCC, KPCC built a removable dining facility at a military base in Kirkuk, Iraq in 2006-07. First Amended Complaint, #12, Ex. 1. KBR's second subcontract with KPCC, the one at issue in this case, was for KPCC to provide dining services at this facility. This second subcontract, awarded by KBR to KPCC on September 1, 2010, No. GCA90M-VC-SDF0920, was subject to a U.S. federal government contract, an indefinite-delivery-indefinite quantity ("ID/IQ") contract, awarded to KBR and administered by the Department of the Army under the Logistics Civil Augmentation Program ("LOGCAP III Contract" or "LOGCAP III"), under which the Army issued "task orders" to KBR to provide various services, including food services for hundreds of thousands of troops in military dining facilities ("DFACs") on military bases throughout Iraq on a cost-reimbursement or fixed-price basis, to support Operation Iraqi Freedom. #1, Ex. 5, Declaration of Cheryl Ritondale.

-1-

Brown & Root Services, Inc. ("KBR") to lease one of Plaintiff Kuwait Pearls Catering Company, WLL's ("KPCC's") dining facilities and for KPCC to operate food services for U.S. troops at that military dining facility ("DFAC") in Kirkuk, Iraq, designated Forward Operation Base ("FOB") Warrior (C7)," during Operation Iraqi Freedom, and (2) fraud in the inducement.  This case was removed from state court pursuant to 28 U.S.C. § 1442 (federal officer removal) and §§ 1331 and 1441 (federal question).  Pending before the Court are two motions  with overlapping and intertwined substantive legal issues:  (1) KPCC's motion to remand (instrument #11) and (2) KBR's motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)(#4).

KPCC contends that the second subcontract required KBR to lease the FOB Warrior (C7) and all the equipment needed to operate the DFAC and that it also gave KBR the option to purchase the DFAC on behalf of the United States.  KPCC claims that KBR represented that it intended to purchase the facility.  The Original Petition asserts that KBR and KPCC negotiated the purchase of FOB Warrior (C7) by KPCC from April to July 11, 2011. KPCC's suit alleges that KBR breached the subcontract by failing to purchase the DFAC at FOB Warrior (C7) on behalf of the United States Government and that KBR committed fraud in falsely representing to KPCC that KBR would purchase the facility.

With supporting documentary evidence,[2] KBR claims that in these negotiations it acted at the direction of the United States Government and that it ultimately discontinued the negotiations, also under the direction of the United States, which tightly controlled KBR in its role operating the DFACs on military bases in Iraq.  KBR explains that in October 2011 it was informed that the United States considered the DFACs to be "real property" that had to be turned over to the Government of Iraq after the withdrawal of U.S. troops,[3] pursuant to Article 5, ¶ 1, at 4, of an Agreement Between the United States of America and the Republic of Iraq on Withdrawal of United States Forces from Iraq and the Organization of their Activities during Their Temporary Presence in Iraq (the "Security Agreement"), executed on November 17, 2008 and effective as of January 1, 2009, Ex. 7 to #1; also Ex. 2 to #5).  This Security Agreement set the deadline of December 31, 2011 for withdrawal of all American military forces and stated, "Iraq owns all buildings, non-relocatable structures and assemblies connected to the soil that exist on agreed facilities and areas, including those that are used, constructed, altered, or improved by the United States Forces."  Ex. 7 to #1,

---

[2] See #1, Exhibit 5, Ritondale Decl. ¶¶ 3, 7-11; Ex. 5A, 4/2/11 email from Procuring Contracting Officer Kathie Potter to M. Young at KBR regarding DFACS and Equipment, at KBR00231-32.

[3] See #1, Exhibit 5B, email from U.S. Deputy Program Director for LOGCAP Robert Thompson regarding DFAC at Kirkuk and Tikrit, at KBR00247-48; 10/17/11 email from M. Young (KBR) to R. Thompson; 10/17/11 email from K. Potter to M. Young at KBR00246-47; 10/18/11 email from N. Bull (KBR) to K. Potter, at KBR00245-46; Ex. 5C, USF-I Memorandum, Subject:  Determination of Dining Facilities at Kirkuk and Tikrit as Real Property and Equipment as Personal Property (Nov. 1, 2011), at KBR0028.

Art. 5, ¶ 1, at 4.  It also called for the handover to the Iraqi Government of all military bases, facilities, and related real property upon the withdrawal of U.S. forces.  *Id.* at ¶¶ 2, 6, at 4-5.

KPCC responds that this explanation for the United States' decision not to purchase the facility "made no logical sense" because the 2009 Security Agreement was entered into more than a year before the subcontract, and the subcontract made no mention of the Security Agreement.  If KBR's explanation is true, it was never possible for KBR to meet the terms of the subcontract, and thus KPCC was denied the very consideration for which it had bargained.  KPCC claims that in one of a series of emails in which the United States Government acknowledged that its failure to honor the purchase option was a breach of the subcontract, KBR admonished that it would be liable to KPCC under the subcontract if the FOB Warrior (C7) were seized by the United States Government without just compensation, i.e., a "taking" under the Fifth Amendment.  Moreover, KPCC points out that after KBR notified KPCC that it would not purchase the facility, KBR continued to use it without making any further lease payments and refused to reimburse KPCC for its costs.  In addition, according to the express term of the subcontract, the decision to purchase FOB Warrior (C7) was within the "sole discretion" of KBR.[4]

---

[4] Section 4.5.2 of the subcontract provides,

> For leased Assets, the CONTRACTOR may, at its sole discretion at any time during the lease, unilaterally opt to purchase the Assets at the Purchase Price less any lease payments

KBR contends that it removed this case to this Court based on its assertion of five affirmative defenses in state court that vested jurisdiction exclusively in the federal courts: "(1) a claim of derivative sovereign immunity, (2) involving non-justiciable political questions; (3) the act of state doctrine; (4) the government contractor defense; and (5) the Defense Production Act of 1950," § 1 *et seq.*, 50 App. U.S.C.A. § 2061, *et seq.*, #11 at p.4.

KPCC argues that none of these defenses is sufficient to support a removal of this case to federal court. Furthermore, although KBR insists that it can remove the suit because it was acting under the direction of a federal officer under 28 U.S.C. § 1442(a)(1), KPCC insists that KBR was not acting as an agent of the United States Government in performing the subcontract and that KBR retained "sole discretion" in its performance and in making its own decision not to purchase the FOB Warrior (C7). Therefore the federal removal statute, 28 U.S.C. § 1442, does not apply to KBR.

─────────────────

that have been made. Nothing in this SUBCONTRACT shall obligate the CONTRACTOR to exercise the option; however, at any time the total lease payments made to SUBCONTRACTOR equals the quoted purchase price of a leased asset, the obligation of the CONTRACTOR to pay monthly lease payments ceases. If the option to purchase is exercised, title to the asset passes to the CONTRACTOR upon full payment of the Purchase Price minus lease payments.

Because the removal/remand issue determines whether this Court has jurisdiction to rule on the motion to dismiss, the Court addresses the motion to remand first.

As a threshold matter, KPCC contends that in this breach of contract and fraud in the inducement case Texas law governs and there are no federal questions or federal statutes that will resolve the issues in this action.  KBR correctly points out that Texas law does not govern this case.  KPCC drew its erroneous conclusion from the subcontract's provision in section 11.0 5, "Alternative Dispute Resolution" clause, which by its own terms does not apply here:  "AS AN EXCLUSIVE SUBSTITUTE FOR INITIATING ANY ACTION IN LAW OR EQUITY IN ANY COURT OR OTHER JUDICIAL PROCESS, THE PARTIES AGREE THAT THE FOLLOWING DISPUTE RESOLUTION PROCEDURE SHALL BE COMPLIED WITH: . . . ."  First Amended Complaint, #12, Exhibit 1, at 000039,   Instead the 2010 subcontract incorporated the FAR (see footnote 1)(at 000034), clause 52.233-4 (at 000035) for "Applicable Law for Breach of Contract Claim" (Oct. 2004), which states "*United States law* will apply to resolve any claim of breach of this contract."  48 C.F.R. § 52.233-4 (emphasis added).

**Relevant Law:  Federal Officer Jurisdiction**

The "federal officer" statute, 28 U.S.C. § 1442(a)(1)("Federal officers or agencies sued or prosecuted"), as amended effective November 2011, provides in relevant part,

> (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the

> district and division embracing the place
> wherein it is pending:
>
>> (1) The United States or any agency
>> thereof or any officer (or any person
>> acting under that officer) of the United
>> States or of any agency thereof, in an
>> official or individual capacity, for or
>> relating to any act under color of such
>> office or on account of any right, title
>> or authority claimed under any Act of
>> Congress for the apprehension or
>> punishment of criminals or the
>> collection of the revenue.

"Acting under" has usually been interpreted to require "some federal directives of particular detail that relate to the conduct for which the person seeking to remove is being sued in state court." Kristine Cordier Karnezis, "Who is 'Person Acting Under' Officer of United States of Any Agency Thereof for Purposes of Availability of Right to Remove State Action to Federal Court Under 28 U.S.C.A. § 1442(a)(1)," 166 *A.L.R. Fed.* 297 (2000). Most courts have ruled that corporations can be "persons" within the meaning of § 1442(a)(1). *Id.* "The courts generally support the proposition that persons are 'acting under' a federal officer for purposes of removing actions against them to federal court, under 28 U.S.C.A. § 1442(a)(1), when the activities forming the basis of the suit against them were performed pursuant to federal directives (at §4)," "or pursuant to a federal officer's 'direct orders or comprehensive and direct regulations.'" *Id.* at § 2[a]. In *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 151-52 (2007), the Supreme Court construed the phrase as meaning not only subject to the instruction, direction of" a federal officer, but also a private person's "effort to *assist*, or to help *carry out*,

the duties of a federal superior." That "help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law"; "under" requires being "subordinate or subservient to," "[s]ubject to guidance, tutorship, or direction of." *Id.* at 151-52. *See also Bell v. Thornburg*, 743 F.3d 84, 88-89 (5th Cir. 2014).

"The purpose of this [federal officer] removal statute is to protect the lawful activities of the federal government from undue state interference. It allows suits to be removed despite the non-federal cast to the complaint and reflects a congressional policy that federal officers and the federal government itself require the protection of a federal forum." *Leonard v. Board of Supervisors of Louisiana State University and Agr. and Mechanical College*, Civ. A. No. 13-565-JJB-SCR, 2014 WL 2197042, at *2 (M.D. La. Jan. 17, 2014), *adopted*, 2014 WL 2203876 (May 27, 2015). As the Supreme Court opined in *Willingham v. Morgan*, 395 U.S. 402, 406 (1969), *quoting Tennessee v. Davis*, 100 U.S. 257, 263 (1880), the federal government

> 'can only act through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection,--if their protection must be left to the action of the State court,--the operations of the general government may at any time be arrested at the will of one of its members.'
>
> For this very basic reason, the right of removal under § 1442(a)(1) is made absolute

> whenever a suit in a state court is for any
> act 'under color' of federal office,
> regardless of whether the suit could
> originally have been brought in a federal
> court.   Federal jurisdiction rests on a
> 'federal interest in the matter,' . . . the
> very basic interest in the enforcement of
> federal law through federal officials.

*See also State of La. v. Sparks*, 978 F.2d 226, 232 (5th Cir. 1992)(main purpose of statute is to "prevent federal officers who simply comply with a federal duty from being punished by a state court for doing so.").

There are significant differences between the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and the general federal question removal statute, 28 U.S.C. § 1441.  The latter is strictly construed in favor of remand, while the federal officer removal statute is liberally construed. *Legendre v. Anco Insulations, Inc.*, Civ. A. No. 12-94-JJB-SCR, 2012 WL 2064537, at *1 (M.D. La. May 14, 2012); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981)("the policy favoring [federal officer] removal should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)").  At minimum, the federal officer statute is sufficiently broad "to cover all cases where federal officials can raise a colorable defense arising out of their duty to enforce federal law" and to have those defenses litigated in the federal courts. *Willingham*, 396 U.S. at 406-07.  A defendant does not have to show that it will prevail on all of its asserted federal defenses; a showing that at least one of its federal defenses is plausible is sufficient. *Mesa v. California*, 489 U.S. 121, 129 (1989); *Willingham*, 395 U.S. at 409.  *See also Jefferson County,*

*Ala. v. Acker*, 527 U.S. 423, 431 (1999)("Under the [exceptional] federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law."). There is no requirement under § 1442(a)(1) that the court must have original jurisdiction over the plaintiff's claim; instead, in contrast to the general removal statute, the case may be removed where no federal question is apparent on the face of the plaintiff's well pleaded complaint, but where a federal question arises in a defense. *St. Bernard Port, Harbor & Terminal District v. Violet Dock Port, Inc. LLC*, Civ. A. No. 11-8, 809 F. Supp. 2d 524, 530 (E.D. La. Feb. 7, 2012). Nor do all of the defendants need to join in the notice of removal under § 1442(a)(1). *Ely Valley Mines, Inc. v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981).

To remove a case from state court under the federal officer statute, the defendant, who bears the burden of establishing that jurisdiction exists, must "(1) demonstrate that it is a 'person' within the meaning of the statute; (2) establish that it acted pursuant to a federal officer's directions and that a causal nexus exists between the defendant's actions under the color of federal office and the plaintiff's claims; and (3) assert a colorable federal defense to state-law liability." *Government Contract Disputes* § 22:9 (2015 ed.); *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398(5th Cir. 1998), *cert. denied*, 526 U.S. 1034 (1999). Most courts, including the Fifth Circuit, have held that corporations can be "persons" within the meaning of the

statute. *See Winters v. Diamond Shamrock Chemical Co.*, 901 F. Supp. 1195, 1197 (E.D. Tex. 1995)("We have previously held that corporate entities qualify as 'person' under § 1442(a)(1), *aff'd*, 149 F.3d 387 (5th Cir. 1998), *cert. denied*, 526 U.S. 1034 (1999); *International Primate Protection League*, No. 93-3067, at 2 (5th Cir. May 4, 1994)(unpublished opinion)."), *cert. denied*, 526 U.S. 1034 (1999).  For the causal connection prong, the defendant must show there is a causal connection between what the defendant has done under federal authority and plaintiff's state-law claims, between the asserted official authority and the charged conduct. *Willingham*, 395 U.S. at 409. The federal direction must be sufficiently detailed to prove that there is a substantial federal interest involved in the activity. *Winters*, 901 F. Supp. 195. The last prong, a colorable federal defense, is one grounded in federal law and arising out of the removing party's compliance with the demands of a federal officer. *Mesa v. California*, 489 U.S. 121, 129-30 (1989).[5]  "Federal officer removal must be predicated on the allegation of a colorable federal defense." *Id. See also State of Texas v. Carley*, 885 F. Supp. 940, 942 (W.D. Tex. 1994)("Appropriate removal of a State action by a federal officer under 28 U.S.C. § 1442(a) requires enunciation of a federal defense by one who is a federal officer or acting under the authority of a federal officer.").  "The defense need only be

---

[5] For example, in *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d at 399-400, the Fifth Circuit found the Government's specification of the chemical composition, packaging, and delivery of Agent Orange was sufficient exertion of control to constitute federal direction under § 1442(a)(1).

plausible; its ultimate validity is not determined at the time of removal." *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996), *citing Mesa*, 480 U.S. at 129.

KBR's answer to the complaint asserts several federal defenses:  derivative sovereign immunity, government contractor defense, political question doctrine, and immunity under the Defense Production Act.  KBR subsequently added the act of state doctrine to these defenses.

Generally the United States is immune from suit unless it waives that immunity. *United States v. Mitchell*, 445 U.S. 535, 538 (1980).  Under the Federal Employees Liability Reform and Tort Compensation Act ("FTCA"), 28 U.S.C. §§ 1346, *et seq.*, the United States waived its sovereign immunity to tort actions, but with some exceptions, including one for an entity performing a discretionary act on behalf of the federal Government.  A discretionary function is one that "involves an element of judgment or choice." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  The discretionary function exception, 28 U.S.C. § 2680, states that "provisions of this chapter . . . shall not apply to--(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused, however, applies only to suits against the Government, its

-12-

employees, and agents." It expressly excludes independent contractors and employees of the government. 28 U.S.C. §§ 2674 and 2671 ("[T]he term 'Federal Agency' . . . does not include any contractor with the United States . . . . 'Employee of the government' includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, member of the National Guard . . . , and persons acting on behalf of a federal agency in an official capacity . . . and (2) any officer or employee of a Federal public defender organization . . . ." The discretionary function exception includes both these terms. A "critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" *Law v. Aetna Life Ins. Co.*, No. 5:09-cv-116-DCB-JMR, 2011 WL 4529627, at *5 (S.D. Miss. Sept. 28, 2011), *citing United States v. Orleans*, 425 U.S. 807, 814 (1976)(*quoting Logue v. United States*, 412 U.S. 521, 528 (1973)).

KBR has asserted a government contractor defense. The government contractor defense is related to the FTCA's retaining sovereign immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(j). Some courts have held that a private federal government contractor is protected by derivative sovereign immunity if it shows that (1) it "was working pursuant to the authorization and direction of the federal government" and that

-13-

(2) "the acts of which the plaintiff complained fell within the scope of those government directives." *See, e.g., In re World Trade Center Disaster Site Litig.*, 521 F.3d 169, 196 (2d Cir. 2008), *citing Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20-21 (1940). *See also Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 539 (M.D.N.C. 2008)("Courts have recognized a brand of derivative immunity relating to work primarily arising from the performance of government contracts.  The doctrine of derivative federal sovereign immunity arose as an exception to federalism and is based on the notion that the immunity traditionally afforded the federal government should extend under limited circumstances to certain parties who carry out its will.").  The government contractor defense applies to both service and supply contracts. *Hudgens v. Bell Helicoptors/Textron*, 328 F.3d 1329, 1334 (11th Cir. 2003).

The concept of derivative sovereign immunity is rooted in *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940).  In *Yearsley*, *id*. at 20-21, the Supreme Court held that a contractor that built dikes in the Missouri River pursuant to a contract with the federal government could not be held liable for erosion damage caused by its construction because the contract for it was authorized by an act of Congress and, as the Court concluded, when "authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."  Only if the agent or officer of the Government exceeded his authority or his authority was not validly

conferred can he be held liable for his conduct causing injury to another. *Id.* at 21. *See also Filarsky v. Delia*, 132 S. Ct. 1657, 1665-66 (2012)(holding that a private individual temporarily retained by the government to carry out its work is entitled to seek qualified immunity from suit under § 1983; "immunity 'protect[s] the government's ability to perform its traditional functions.'  It does so by helping to avoid 'unwarranted timidity' in the performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing harmful distractions from carrying out the work of government that can often accompany damages suits. . . .  Indeed, it is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals. [citations omitted]").

In *Ackerson v. Bean Dredging LLC*, 589 F.3d 196 (5th Cir. 2009), the Fifth Circuit applied *Yearsley* to claims against private contractors who contracted with the Army Corps of Engineers to dredge the Mississippi River and who caused environmental damage to the property of local residents, but found that plaintiffs failed to plead facts showing that the dredging defendants did not execute the dredging as required by the Army Corps of Engineers, as well as by the specific permits and authorizations it obtained, nor that they violated relevant regulations.

"While *Yearsley* established that a private corporation performing governmental functions pursuant to contractually delegated authority will not be liable in tort to third parties,

it is also acknowledged that an agent or officer of the Government
purporting to act on its behalf, but in actuality exceeding his
authority, shall be liable for his conduct causing injury to
another." *In re KBR, Inc.*, 736 F. Supp. 2d 954, 967 (D. Md.
2010), *citing Yearsley*, 309 U.S. at 21.   Derivative sovereign
immunity is also not available to federal contractors who perform
their obligations under the contract negligently.   *Yearsley*, 309
U.S. at 20-21; *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207
(5th Cir. 2009).

Almost fifty years after *Yearsley*, in *Boyle v. United
Technologies Corp.*, 487 U.S. 500 (1988)(a wrongful death action
was brought against an independent contractor who supplied
military helicopter to the United States after the helicopter
crashed), "in the context of government contractors claiming
immunity under the [FTCA]," the Supreme Court held that "federal
common law displaces state tort law [only] if (1) the matter
involves a uniquely federal interest [such as the procurement of
military equipment] and (2) there is a significant conflict
between the federal interest or policy and the operation of state
law, or the application of state law must frustrate the specific
policy objectives of federal legislation," such that "the
contractor could [not] comply with its contractual obligations and
the state prescribed duty of care."   *Id.* at 507, 509.   *In accord,
In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 460 (5th Cir.
2010). "The conflict with federal policy need not be as sharp as
that which must exist for ordinary preemption when Congress
legislates 'in a field in which the States have traditionally

occupied.'`" *Boyle*, 487 U.S. at 507, *quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). In *Boyle*, 487 U.S. at 502 (holding that there was a unique federal interest in the government's obligations and rights under its contracts for procuring military equipment from private parties and that government contractor Sikorsky Division of United Technologies Corporation could not be held liable for an allegedly defective helicopter design that caused the death of a marine copilot because the design met the requirements of the military contractor defense), the Supreme Court addressed the "government contractor defense" in dealing with the question whether a contractor providing military equipment to the United States Navy could be immune from state tort liability for the design defect of a helicopter that purportedly caused the death. The Supreme Court concluded that there must be a "uniquely federal interest" with a significant conflict between federal policy and the state law, or that application of state law would frustrate specific objections of federal legislation, which justifies displacing state law with federal common law. 487 U.S. at 504, 507-08.[6] The Supreme Court found unique federal interests in that case in the obligations and rights of the United States under its contracts, the liability of federal officers for official acts, and civil liabilities arising

---

[6] In *Boyle*, "the state-imposed duty of care that is the asserted basis of the contractor's liability (specifically, the duty to equip helicopters with the sort of escape-hatch mechanism petitioner claims was necessary) is precisely contrary to the duty imposed by the Government contract (the duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications)." 487 U.S. at 509.

out of federal procurement contracts relating to national defense. *Id.* at 504-06.  To warrant this derivative immunity for design defects in military equipment, the contractor must show that he complied with three requirements:  (1) "reasonably precise specifications" approved by the federal government; (2) equipment by the contractor that met these specifications; and (3) a warning to the federal government by the contract of a defect unknown to the government." *Id.* at 512.[7]  "The very essence of the defense is to 'prevent the contractor from being held liable when the government is actually at fault,' for '[w]hen a contractor acts under the authority and direction of the United States, it shares in the immunity enjoyed by the Government.'" *In re World Trade Center Disaster Site Litig.*, 456 F. Supp. 2d 520, 562 (S.D.N.Y. 2006).  If, however, the private contractor acts independently from the precise government directions and approvals, the private contractor is not entitled to the defense. *Id.*  In addition, the

------

[7] The *Boyle* court observed, 487 U.S. at 512-13,

The first two of these conditions would assure that the suit is within the area where the policy of the "discretionary function" would be frustrated--i.e., they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself.  The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability. We adopt this provision lest our effort to protect discretionary functions perversely impede them by cutting off information highly relevant to the discretionary decision.

government must supervise and control the contractor's acts. *Id.*
In sum, "under *Yearsley*, a government contractor is not subject to
suit if (1) the government authorized the contractor's actions and
(2) the government 'validly conferred' that authorization, meaning
it acted within its constitutional power." *In re KBR, Inc., Burn
Pit Litig.*, 744 F.3d 326, 342 (4th Cir. 2014)(*citing Yearsley*, 309
U.S. at 20-21), *cert. denied sub nom. KBR, Inc. v. Metzger*, 135 S.
Ct. 1153 (2015). In *In re Katrina Canal Breaches Litig.*, 620 F.3d
455, in which the contractor's allegedly negligent and improper
actions in fulfilling a contract with the Army Corps of Engineers
caused flood damage,  the Fifth Circuit reversed the district
court's summary judgment granting immunity to the contractor on
the grounds that the Army Corps of Engineers' specifications for
the work at issue (regarding the composition of the material used
as backfill or application of any testing process on it before
approval) were not reasonably precise.

        The Fifth Circuit, however, has ruled that "*Yearsley*
itself countenances against its application to deprive the federal
court of jurisdiction. *Yearsley* does not discuss sovereign
immunity or otherwise address the court's power to hear the case.
. . . Based on the Supreme Court's actions in *Yearsley*, we hold
that concluding *Yearsley* is applicable does not deny the court of
subject-matter jurisdiction." *Ackerson*, 589 F.3d at 207-08. *In
accord, Adkisson v. Jacobs Engineering Group, Inc.*, 790 F.3d 641,
646-47 (6th Cir. 2015). As noted earlier, there is no agency
requirement for government-contractor immunity under *Yearsley*.

*See, e.g., Ackerson*, 589 F.3d at 204-07.  *See also* footnote 14 of this Opinion and Order.

"Throughout the history of the federal judiciary, political questions have been held to be nonjusticiable and therefore not a 'case or controversy' as defined by Article III" of the federal Constitution.  *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker Dauntless Colocotronis*, 577 F.2d 1196, 1202 (5th Cir. 1978), *cert. denied*, 442 U.S. 928 (1979).  As the Fifth Circuit opined in *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008),

> "Questions in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 170 . . . (3803).  This "political question" doctrine reflects the principle that, under our Constitution, there are some questions that cannot be answered by the judicial branch.  Out of due respect for our coordinate branches and recognizing that a court is incompetent to make final resolution of certain matters, these political questions are deemed 'nonjusticiable.' *See Baker* [ *v. Carr*, 369 U.S. 186, 198 (1962)].[8]  A declation of

---

[8] The *Baker* Court concluded, "Political questions are labeled "nonjusticiable' because there is an undeniable difference between finding no federal jurisdiction at the outside of a case and declaring that a particular matter is inappropriate for judicial resolution only after some consideration of the merits.

> In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded."

> jurisdiction under the doctrine presupposes
> that another branch of government is both
> capable of and better suited for resolving
> the "political" question. *See Vieth v.*
> *Jubelirer*, 541 U.S. 267, 277 . . . (2004)'
> *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478
> U.S. 221, 229-30 . . . (1986).

The political question doctrine applies to cases that "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n*, 478 U.S. at 230. The doctrine perceives the judiciary as "fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *Id.* Out of deference to the other branches under separation of powers, the doctrine holds that such cases are not subject to judicial review. *Baker v. Carr*, 369 U.S. 186, 210 (1962)("The nonjusticiability of a political question is primarily a function of the separation of powers."). "[T]he Supreme Court clearly recognized that the political question doctrine partakes not only of the existence of separation of powers, but also of the limitation of the judiciary as a decisional body." *Occidental of Umm al Qaywayn*, 577 F.2d at 1203, *citing Coleman v. Miller*, 307 U.S. 433 (1939).

In *Baker v. Carr*, 369 U.S. at 217, the Supreme Court identified six factors to determine whether there is a political question: "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving

---

*Lane*, 529 F.3d at 557-58, *citing Baker*, 369 U.S. at 198.

it;[9] or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements of various departments on one question." *Carpenter v. Sikorsky Aircraft Corp.*, ___ F. Supp. 3d ___, 2015 WL 1893146, at *9 (C.D. Cal. Apr. 27, 2015), *citing Baker v. Carr* at 210). A case must be dismissed for lack of jurisdiction on political question grounds if, and only if, the case requires the court to determine a question possessing one of these six factors. *Baker*, 369 U.S. at 217; *Occidental*, 577 F.2d at 1201.

For a private party to invoke the doctrine to argue that judicial resolution of the case is not appropriate, it must show

---

[9] As noted in *McMahon*, 502 F.3d 1331, 1363 (11th Cir. 2007), "Courts have frequently held that certain military judgments are outside the competence of courts." One example cited was *Akepe v. USA*, 105 F.3d 1400, 1404 (11th Cir. 1997), in which the appellate court opined,

> In order to determine whether the Navy conducted the missile firing drill in a negligent manner, a court would have to determine how a reasonable military force would have conducted the drill. . . . Decisions relative to training result from a complex, subtle balancing of many technical and military considerations, including the trade-off between safety and greater combat effectiveness. . . . [C]ourts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life.

(1) that the asserted claims require examination of some decision by the executive or legislative branch, and (2) the decision is insulated from judicial review. *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1359 (11th Cir. 2007). The Fifth Circuit "has consistently 'followed the command that matters implicating foreign affairs and military relations and military affairs are generally beyond the authority or competency of a court's adjudicative powers.'" *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011), *citing Lane*, 529 F.3d at 559 ("This court has followed the command that matters implicating foreign relations and military affairs are generally beyond the authority or competency of a court's adjudicative powers."). Nevertheless, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance"; one must apply the *Baker* factors in that determination. *Baker*, 369 U.S. at 211.

In a contract covered by section 707 of the Defense Production Act of 1950, 50 U.S.C. § 4557,[10] no person can be held liable for compliance with a rule, regulation or order issued under the Act. The statute provides, "No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act [sections 2061-2170, 2171, and 2172 of this Appendix], notwithstanding that any such rule, regulation, or order shall thereafter be declared by

---

[10] Formerly cited as 50 App. U.S.C.A. § 2157.

judicial or other competent authority to be invalid . . . ." *Id.*
at 50 U.S.C. § 2157.   "Section 707 of the Act immunized
contractors who were forced under threat of criminal sanction to
perform contracts for the Defense Department from certain
liabilities stemming from the performance of those contracts."
*Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 945 (E.D.N.Y. 1992),
*aff'd on other grounds*, 996 F.2d 1425 (2d Cir. 1993), *cert. denied
sub nom. Ivy v. Diamond Shamrock Chemicals Co.*, 510 U.S. 1140
(1994).   That "[t]he LOGCAP III Contract was designated a 'rated
order' contract, [made] its performance mandatory under the
Defense Production Act of 1950 . . . 50 U.S.C. § 2061-2171   The
willful failure to perform a rated order contract carries a
criminal penalty  *See id.* § 2071(a) and 2073)."   *Martin v.
Halliburton*, 618 F.3d 476, 480 (5ᵗʰ Cir. 2010).

### KPCC's Motion to Remand (#11)

KPCC argues that KBR was not acting as an agent of the
United States and that it retained discretion in the performance
of its work.   Although KBR claims removal jurisdiction under §
1442(a)(1), KPCC maintains that KBR had no authority to breach a
contract with a third-party vendor.   Nor was it acting as an
official of the government in choosing, in its "sole discretion,"
to breach the subcontract.   KPCC quotes Judge Keith Ellison's
opinion in *McGee v. Arkel Int'l, LLC*,[11] 716 F. Supp. 2d 572, 575
(S.D. Tex. 2010):

---

[11] The other two defendants in *McGee* were KBR Technical
Services, Inc. and Kellogg, Brown & Rooter Services, Inc.

> To establish that a person was "acting under" a federal officer, the defendant must show a causal nexus between the conduct charged in the plaintiffs' claims and the acts performed by the defendant at the direction of federal authority. *Willingham* [395 U.S. at 409]; *Arness v. Boeing North American, Inc.*, 997 F. Supp. 1268, 1274 (C.D. Cal. 1998). The federal officer must have "direct and detailed control over the defendant" such that "the acts that form the basis for the suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations." *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1993); *Arness*, 997 F. Supp. at 1273 (quoting *Fung v. Abex Corp.*, 816 F. Supp. 569. 572 (N.D. Cal. 1992). However, if the corporation "establishes only that the relevant acts occurred under the general auspices of federal direction then it is not entitled to 28 U.S.C. § 1442(a)(1) removal." *Arness v. Boeing North American, Inc.*, 997 F. Supp. at 1273 . . . .

*In accord, Good v. Armstrong World Indus.*, 914 F. Supp. 1125, 1128 (E.D. Pa. 1996).

This Court observes that in *McGee,* Judge Ellison ruled in favor of KBR and denied the motion to remand. Judge Ellison specifically found that KBR was acting in complete compliance with the direct and specific orders that it received from the military, that KBR had no discretion, and that all the work was performed under the direct and detailed control of the military.

KPCC insists such was not the case in this action: nothing in the directive from the United States government instructed KBR not to pay KPCC the contractually agreed upon price for the dining facility or how to breach the contract with KPCC, so KPCC insists that § 1442 does not apply.

KPCC also contends that KBR's affirmative defenses lack merit and are not sufficient to create removal jurisdiction, and therefore the case should be remanded.  This Court would point out that KPCC erroneously applies the law relating to standard of the general removal statute for federal question jurisdiction, 28 U.S.C. §§ 1441(a), to argue there was no basis for the removal under the federal officer removal statute, § 1442(a)(1):  KPCC claims that removal is only permissible if a federal cause of action is pleaded on the face of the petition by a plaintiff who is the master of his complaint, or that the narrow exception for state-law claims requiring the resolution of federal law applies, while a federal defense to a state law claim will not support federal question jurisdiction.  *Louisville & Nashville R.R. v. Motley*, 211 U.S. 149, 152 (1908); *Caterpillar, Inc. v. Williams*, 482 U.S. 386,392-93 (1987); *Grabble & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).  *But see* pages 9-10 of this Opinion and Order.

KPCC also argues that derivative sovereign immunity does not apply because the Texas Supreme Court recently held that sovereign immunity does not extend to government contractors sued for their own conduct.  *Brown & Gay Engineering, Inc. v. Olivares*, 461 S.W. 3d 117, 124 (Tex. 2015)(holding that sovereign immunity does not extend to private independent contractors hired on a government contract and exercising independent discretion for the

actions allegedly causing the plaintiff's loss, for which they were sued).[12]

### KBR's Response (#19)

KBR argues, and the Court concurs, that KBR properly removed this case under 28 U.S.C. § 1442(a)(1) because the evidence it has submitted establishes that United States federal officers directed and controlled KBR's actions in negotiations to purchase the DFAC at FOB Warrior (C7) on behalf the United States Government and has thus established the existence of federal jurisdiction.   The Court also has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1441 (1) because the case arises "under the Constitution, laws or treaties of the United States" and involves uniquely federal interests and (2) because adjudication of KPCC's claims will require the Court to resolve substantial disputed questions of federal law.   Specifically KBR points out that KPCC's claims require the Court to interpret the provisions of the Security Agreement and to analyze the relationship between the Security Agreement and substantial federal laws governing the classification and disposal of "foreign excess real property" by the Executive branch agencies, including the Department of Defense.   *See* 40 U.S.C. §§ 701, *et seq.* (2002); 10 U.S.C. §§ 2662, *et seq.*, (2011); 41 C.F.R. § 102-171, *et seq.*; Department of Defense Directive 4165.06 (Nov. 18, 2008); and Department of Army Regulation 405-90 (May 10, 1985).   KBR also lists provisions of the Federal Acquisition Regulation that govern

_____

[12] As noted earlier, Texas law does not apply here.   See p. 6 of this Opinion and Order.

the award and administration of subcontracts under federal prime contracts, such as LOGCAP III.

In addition to the evidence attached to its Original Petition, Notice of Removal (#1), and First Amended Complaint (#12), KBR now submits a recently obtained declaration of Kathie Potter ("Potter"), government Procuring Contracting Officer-Forward ("PCO-Forward") serving in Iraq, "with direct and frequent interaction with KBR and its personnel regarding their duties and responsibilities under the LOGCAP III contract," from November 2010-April 2012, who administered the LOGCAP III Contract and directed KBR's actions in its interactions with KPCC. #19-1, Exhibit 1. KBR emphasizes that this declaration evidences the following events of the United States government's direction and control of KBR's actions that are in dispute: (1) Federal officers approved the subcontract agreement between KBR and KPCC to provide DFAC food service at operational facilities at FOB Warrior (C7), ¶ 5; (2) Potter directed KBR to negotiate with KPCC to purchase FOB Warrior (C7) DFAC and its equipment[13] in the spring of 2011, as USF-I began closing numerous bases and facilities in Iraq and arranged to continue operations at other sites under the new mission of supporting the Office of Security Cooperation-Iraq ("OSC-I"), as FOB Warrior (C7) was to remain operational, ¶ 6; (3) Potter was aware that in 2008 the United States and Iraqi Governments negotiated the Security Agreement (Exhibit B)for withdrawal of U.S. forces from Iraq, ¶ 7; (4) toward the end of

---

[13] Potter's April 2, 2011 email to KBR, attached as Exhibit A.

2011, following a review by its J7 directorate and its Office of the Staff Judge Advocate, "USF-I determined that the DFAC building at FOB Warrior (C7) was real property under the terms of the Security Agreement's Article 5, and under MNF-I Policy, and informed LOGCAP officials that the United States could not purchase the DFAC because ownership rested with the land, which under the Security Agreement was the Government of Iraq," ¶ 8; (5) Potter accordingly directed KBR to suspend negotiations in late 2011; (6) Potter directed KBR to instruct KPCC not to remove or damage the DFAC building, fixtures or equipment that the United States determined to be real property, ¶ 9; (7) Potter directed KBR to purchase only movable DFAC kitchen equipment from KPCC, ¶¶ 8-9, Ex. C.; and (8) KBR followed Potter's instructions, ¶ 9.

### Court's Decision

As will be discussed in further detail, KBR has satisfied the requirements for removal under § 1442(a)(1).   Its evidence establishes that contrary to KPCC's allegations that the decisions to purchase the DFAC for the United States or to allow KPCC to demobilize the facility were in KBR's "sole discretion," the United States specifically directed and controlled KBR's actions in its ongoing discussions with KPCC, the heart of KPCC's claims, and thus KBR has met the "acting under" element in assisting the government in conducting operations in Iraq by providing food services to troops at military dining facilities that were constructed and operated by KBR-managed subcontractors and in negotiating leases or purchases on behalf of the government.   KBR has also met the second, "causal nexus" element

of the federal officer removal test in demonstrating the relationship between KPCC's claims and KBR's actions under and in compliance with specific directions of the United States. It has also satisfied the third element for federal officer removal, assertion of colorable federal defenses, in its factual allegations supporting derivative sovereign immunity and the government contractor defense, the political question doctrine,[14] and the Defense Production Act of 1950, as well as its new defense, act of state doctrine. KPCC incorrectly claims that KBR must prevail on the merits of its federal defenses for proper removal; as noted by this Court earlier, KBR needs only to present one plausible defense, and need not prove it, to meet the standard for federal officer removal under § 1442(a)(1), and it has more than done so. *Mesa v. California*, 489 U.S. at 129; *Magnin v. Teledyne Continental Motors*, 91 F.3d at 1427 ("The defense need only be plausible; its ultimate validity is not determined at the time of removal.").

With respect to the three-prong test for federal officer removal under § 1442(a)(1), *Winters*, 149 F.3d at 398, there is no

---

[14] As one example, KPCC's claims implicate the first *Baker* factor, a "textually demonstrable constitutional commitment of the issue to a coordinate political department," because war and foreign policy decisions are constitutionally committed to the Executive Branch: the doctrine of political question typically precludes judicial review of decisions made by the Executive during war time, while the "resolution of a territorial dispute between foreign powers . . . is a matter[] that the President is constitutionally privileged to address." *Lane*, 529 F.3d at 559, 560, *citing Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196, 1203 (5th Cir. 1978)("The resolution of a territorial dispute between sovereigns . . . is a political question which we are powerless to decide."), *cert. denied*, 442 U.S. 928 (1979).

dispute that KBR, a corporation, is a "person" within the meaning of the statute. *Id.* at 1197. With documentary evidence, including the declarations of Cheryl Ritondale and Kathie Potter, KBR has established that it acted pursuant to a federal officer's (Potter's) directions and that a causal nexus exists between the KBR's actions under the color of and pursuant to directions from a federal officer and KPCC's claims (that KBR breached its promise to purchase the DFAC on behalf of the United States and prevented KPCC from demobilizing the DFAC and taking it back to Kuwait and that KBR committed fraud in failing to timely inform KPCC that the United States decided not to purchase the facility and in inducing KPCC to enter into a subcontract when KBR knew or should have known that KPCC did not own the facility). *Willingham*, 395 U.S. at 409. KBR has also asserted several colorable federal defenses to state-law liability, as discussed below. *Mesa v. California*, 489 U.S. at 129-30.

KBR states a plausible claim for derivative sovereign immunity in showing that its actions were "authorized and directed" by the United States government under a "validly conferred" contract. *Yearsley*, 309 U.S. at 20-22. KPCC mistakenly claims that KBR is only entitled to sovereign derivative immunity as a government contractor if it proves that it was "acting as a pure agent" of the government. Pl.'s Motion to Remand at 12. *See Ackerson*, 589 F.3d at 204-06 (rejecting plaintiffs' argument that the federal contractor must show it is

an agent of the government before invoking its immunity).[15]

_____

[15] In *Bynum v. FMC Corp.*, 770 F.2d 556, 564 (5th Cir. 1985), the Fifth Circuit stated, "[I]t is the law at least in this Circuit that the contractor must be an agent of the government before invoking its [government-contractor] immunity." Nevertheless in 2009 in *Ackerson*, 589 F.3d at 204-06 (footnote citations omitted), the Fifth Circuit went to great lengths to explain why, despite this statement in *Bynum*, a contractor does not need to have an agency relationship with the government for the government-contractor defense:

> This statement is not definitive, nor binding, as the Plaintiffs suggest. The *Bynum* court acknowledged that *Yearsley* only contains an "apparent requirement that the contractor possess an actual agency relationship with the government" and that "federal courts certainly have not always required such a relationship." Additionally, this statement is dicta, and we have never held that *Yearsley* requires a common-law agency relationship between the government and a contractor.
>
> The language regarding agency on which the plaintiffs rely appears in an introductory section of the *Bynum* opinion entitled, "Legal Background," which provided "a brief overview . . . of the [modern government contractor] defense's historic analogues and the reasons provided by federal and state courts for the adoption of the modern defense." After concluding its discussion of the legal background, the court set forth a federal common-law defense for military-equipment manufacturers, without discussing, applying, or citing *Yearsley*. Therefore, the court's statements regarding *Yearsley* were unnecessary to its holding and constitute nonbinding dicta.
>
> The court's statement in *Bynum* is not compelled by our prior case law. The *Bynum* court cited to *Whitaker v. Harvell-Kilgore Corp.* in support of its statement that a contractor must be an agent of the government before invoking its immunity. In *Whitaker*, we held that a manufacturer of grenades and a manufacturer of fuses were not agents of the government and therefore not entitled to immunity after a grenade prematurely exploded

Furthermore other remedial options are available to KPCC instead of suing KBR for breach of contract, including an action against the United States Government, which in its

_____

during an Army training exercise.  The *Bynum* court's reliance on *Whitaker* to support its understanding of *Yearsley* is problematic, however, because *Whitaker* does not cite *Yearsley*.  Additionally, the case *Whitaker* does cite to support its holding, *Powell v. United States Cartridge Co.*, is a Fair Labor Standards Act case that likewise does not cite *Yearsley*.  Most importantly, both *Bynum* and *Whitaker* addressed military-contractor product liability and not public-works contractor liability as in *Yearsley*.  The application of the contractor defense in the context of military-equipment manufacturers is an area of law that has since been arguably distinguished from the general *Yearsley* defense in *Boyle v. United Technologies Corp.* and its progeny.

The Supreme Court's decision in *Yearsley* does not require a public-works contractor defendant to establish a traditional agency relationship with the government.  *Yearsley* does use the word "agent" but also uses "contractor" and "representative."  Most notably, the *Yearsley* court did not examine the relationship between the contractor defendant and the government to determine whether the contractor defendant was in fact acting as an agent or whether the contractor acted within the scope of any agency relationship.  Instead, the court merely noted that setting aside the plaintiffs' takings claim, "there is no contention, or basis for one, that if the contractor was acting for the Government in prosecuting its work in aid of navigation without the taking of property, the contractor would be subject to the asserted liability."

Other courts applying *Yearsley* have likewise not discussed an agency requirement. . . . (discussing *Myers v. United States*, 323 F.2d 580 (9th Cir. 1963), as an example).

sovereign capacity, entered into a Security Agreement with sovereign Iraq and subsequently interpreted that Security Agreement allegedly to effect a "taking" of property that was allegedly owned by KPCC. *Yearsley,* 309 U.S. at 21-22, clearly indicates that KPCC may be entitled to just compensation from the United States Government for the alleged "taking" under the Fifth Amendment of the Constitution, but KBR cannot be held liable for following the Government's contractual directives:

> [I]n the case of a taking by the Government of private property . . . , it cannot be doubted that the remedy to obtain compensation from the Government is as comprehensive as the requirement of the Constitution, and hence it excludes liability of the Government's representatives lawfully acting on its behalf in relation to the taking.

*Id.*

This Court agrees with KBR makes a plausible claim in its political question doctrine defense because it would require the judiciary to second-guess "policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n*, 478 U.S. at 230. Because the issue here implicates the first, second, fourth and sixth factors set out in *Baker v. Carr*, 369 U.S. at 217, to prevail, KPCC would have to show that it owned the DFAC in dispute, thus implicating a quintessential foreign policy decision that is constitutionally committed to the Executive Branch, i.e., the decision to concede that under the bilateral Security Agreement the Iraqi government owns the land and real property on designated U.S. military bases. KBR argues that

the issue implicates the second factor because there are no
judicially manageable standards for resolving on the merits
whether the United States military appropriately designated the
DFAC in dispute as "real property," and thus whether the
government's contractual directives to KBR were in error.   The
fourth and sixth *Baker* factors would be at issue if, years after
the United States withdrew its forces from Iraq, the judiciary
disagreed with the terms of the Security Agreement negotiated by
the Executive Branch or with how the military applied those terms
to on American military base in Iraq.[16]

KBR now points out that the acts of state doctrine also
applies because KPCC's claims question the sovereign acts of the
Iraqi government.[17]   KPCC has admitted that the Security Agreement

---

[16] Contending that there is no political question here,
KPCC disagrees about the application of the *Baker* factors.  #13 at
p. 18-19.   It argues that there is no textually demonstrable
constitutional commitment of the issues to a coordinate political
department because KBR does not cite to any section of the
Constitution that reserves the issue of contract compliance to the
Executive or Legislative branch of government.  KPCC insists that
there are judicial standards for resolving this breach of
contract case which courts use every day.   It asserts that the
Court can undertake an independent resolution without
disrespecting the coordinate branches of government, and just as
KBR is responsible for its own contractual obligations, the
Government is responsible for its, and KBR can seek redress
against the Government under its contract.   Finally KPCC states
there is no potential for embarrassment from multifarious
pronouncements of various departments and that KBR fails to
explain how this element is even implicated in this case.

[17] Chief Justice Fuller, speaking for a unanimous United
States Supreme Court in *Underhill v. Hernandez*, 168 U.S. 250
(1897), described the act of state doctrine as follows:

> Every sovereign state is bound to respect the
> independence of every other sovereign state,
> and the courts of one country will not sit in
> judgment on acts of the government of another

> done within its own territory.  Redress of
> grievances by reason of such acts must be
> obtained through the means open to be availed
> of by sovereign powers as between themselves.

Some courts have concluded the act of state doctrine "does not operate by depriving courts of jurisdiction; rather it functions as a doctrine of abstention." *Riggs Nat'l Corp. & Subsidiaries v. Commissioner of the IRS*, 163 F.3d 1363, 1367 & n.5 (D.C. Cir. 1999); *in accord*, *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 74 (2d Cir. 1977), *cert. denied*, 434 U.S. 904 (1977); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1292 (3d Cir. 1979).

The Ninth Circuit, in *DeRoburt v. Gannett Co., Inc.*, 733 F.2d 701, 702-03 (9th Cir. 1984), has held that the act of state doctrine

> although similar to the sovereign immunity
> doctrine, is distinguishable in several
> significant aspects.  Where sovereign
> immunity addresses the jurisdiction of the
> court, the act of state doctrine "is a
> prudential doctrine designed to avoid
> judicial action in sensitive areas." *Inter.
> Ass'n of Machinists, Etc. v. OPEC*, 649 F.2d
> 1354, 1359 (9th Cir. 1981).  Further, in *Banco
> Nacional de Cuba v. Sabbatino*, 376 U.S. 398,
> . . . (1964(, the Court recognized that the
> doctrine ws not compelled by the nature of
> sovereignty, by international law, or by the
> text of the Constitution.  376 U.S. at 421-
> 23. . . . Rather, it derives from the
> judiciary's concern for its possible
> interference with the conduct of foreign
> affairs by the political branches of the
> government. . . . [I]t is a balancing test
> with the critical element being the potential
> for interference with our foreign relations.
> As such, courts should seek to avoid passing
> on the validity of foreign acts . . . .

The Fifth Circuit finds relevant the nonjusticiable political question doctrine and the absence of judicially manageable standards for resolving challenges:

> In their external relations, sovereigns are
> bound by no law; they are like our ancestors
> before the recognition or imposition of the
> social contract.  A prerequisite of law is a
> recognized superior authority whether
> delegated from below or imposed from above-

is "valid, binding, and enforceable" in its motion to remand at page 21.  The Security Agreement states that the United States and Iraq have agreed that "Iraq owns all buildings, non-relocatable structures, and assemblies connected to the soil that exist on agreed facilities."  Ex. 1, Potter Decl., ¶ 7, Ex. B.  It also states that the DFAC located on FOB Warrior (C7) was one of the "agreed facilities" subject to Iraqi ownership.  *Id.*, ¶ 8-9, Ex. C.  Nevertheless KPCC's lawsuit challenges Iraq's assertion of ownership over that DFAC, thus requiring this Court to decide whether Iraq's sovereign claim was wrongful, illegal or otherwise nonbinding.  Under the act of state doctrine, where a United States court is asked to decide the legitimacy of a foreign government's ownership to property located within its sovereign territories, the case must be dismissed, even where the claims are brought solely against private entities.  *See, e.g., Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 436-37 (1964)(holding that Cuba's taking of a sugar shipment within its borders was an act of state); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302-03 (1918)(holding that Mexican government's seizure of property for military purposes was an act of state).[18]  Moreover, as noted, the

_____

> where there is no recognized authority, there is no law.  Because no law exists binding these sovereigns and allocating rights and liabilities, no method exists to judicially resolve their disagreements.

*Occidental of Umm al Qaywayn*, 577 F.2d at 1204-05.

[18] KPCC objects that the act of state doctrine does not apply here, where the issue is the conduct and actions of KBR, not the validity of a foreign government's official act or of the Security Agreement or the policy decisions of the Republic of

Fifth Circuit interprets the act of state doctrine as ground in the political question doctrine.

KBR's government contractor defense is also plausible because, as the evidence reflects, the United States devised detailed specifications regarding the timing and subject matter of KBR's discussions with KPCC, KBR complied with those specifications, and KBR explicitly notified the government of the risks and potential liabilities that might arise if the United States expropriated KPCC's property (Ex. 2, Ritondale Decl. ¶ 10, Ex. 5B).

Finally KBR's Defense Production Act defense is plausible because KPCC is suing KBR as a direct consequence of its compliance with the PCO-Forward's contractual directives under LOGCAP III (a "rated order" issued pursuant to the Act).

Because the Court agrees with KBR as a matter of law that it has properly removed this case under § 1442(a)(1) and because KBR has supported its arguments with persuasive documentary evidence, the Court denies KPCC's motion to remand.

_____

Iraq. *See W.S. Kirkpatrick & Co. v. Environmental Tectoics Corp., Int'l*, 493 U.S. 400, 404 (1990); *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 381, 372 n.14 (5th Cir. 2004)("the act of state doctrine applies only when the dispute implicates the legitimacy of public acts undertaken by a sovereign nation"), *clarified on other grounds on rehearing*, 389 F.3d 503 (5th Cir. 2004). Here KPCC concedes that the Security Agreement is a valid, binding and enforceable agreement by and between the United States and Republic of Iraq, but argues that it does not apply to the facts here, but only to "agreed facilities and areas," and FOB Warrior (C7) was not one of the agreed facilities because it was not turned over to the Iraqi Government by July 30, 2009. Indeed, it argues, if it were part of the Security Agreement, there was no need for the second subcontract with its optional purchase of the Facility.

**KBR's Motion to Dismiss Pursuant to**

**Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)**

*Standards of Review*

*Rule 12(b)(1)*

"When a motion to dismiss for lack of jurisdiction 'is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Crenshaw-Logal v. City of Abilene, Texas*, No. 11-10264, 2011 WL 3363872, *1 (5th Cir. Aug. 4, 2011), *quoting Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *see also Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 762 (5th Cir. Mar. 15, 2011); Fed. R. Civ. P. 12(h)(3). If a complaint could be dismissed for both lack of jurisdiction and for failure to state a claim, "the court should dismiss only on the jurisdictional ground under [Rule] 12(b)(1), without reaching the question of failure to state a claim under [Rule] 12(b)(6)." *Crenshaw-Logal*, 2011 WL 3363872, *1, *quoting Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977). The reasons behind this practice are to preclude courts from issuing advisory opinions and barring courts without jurisdiction "'from prematurely dismissing a case with prejudice.'". *Id.*, *citing Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998), and *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

Rule 12(b)(1) allows a party to move for dismissal of an action for lack of subject matter jurisdiction. The party asserting that subject matter exists, here the plaintiff, must bear the burden of proof by a preponderance of the evidence for a

http://www.

12(b)(1) motion. *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 327 (5th Cir. 2008); *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). In reviewing a motion under 12(b)(1) the court may consider (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is characterized as either a "facial" attack, i.e., the allegations in the complaint are insufficient to invoke federal jurisdiction, or as a "factual" attack, i.e., the facts in the complaint supporting subject matter jurisdiction are questioned. *In re Blue Water Endeavors, LLC*, Bankr. No. 08-10466, Adv. No. 10-1015, 2011 WL 52525, *3 (E.D. Tex. Jan. 6, 2011), *citing Rodriguez v. Texas Comm'n of Arts*, 992 F. Supp. 876, 878-79 (N.D. Tex. 1998), *aff'd*, 199 F.3d 279 (5th Cir. 2000). A facial attack happens when a defendant files a Rule 12(b)(1) motion without accompanying evidence. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). In a facial attack, allegations in the complaint are taken as true. *Blue Water*, 2011 WL 52525 at *3*, citing Saraw Partnership v. United States*, 67 F.3d 567, 569 (5th Cir. 1995). If it is a factual attack, the Court may consider any evidence (affidavits, testimony, documents, etc.) submitted by the parties that is relevant to the issue of jurisdiction. *Id., citing Irwin v. Veterans Admin.*, 874 F.2d 1092, 1096 (5th Cir. 1989). A defendant making a factual attack

on a complaint may provide supporting affidavits, testimony or other admissible evidence. *Patterson v. Weinberger*, 644 F.3d 521, 523 (5th Cir. 1981). The plaintiff, to satisfy its burden of proof, may also submit evidence to show by a preponderance of the evidence that subject matter jurisdiction exists. *Id*. The court's consideration of such matters outside the pleadings does not convert the motion to one for summary judgment under Rule 56(c). *Robinson v. Paulson*, H-06-4083, 2008 WL 4692392 at *10 (S.D. Tex. Oct. 28, 2008), *citing Garcia*, 104 F.3d at 1261. "Unlike in a facial attack where jurisdiction is determined upon the basis of allegations of the complaint, accepted as true[,] when a factual attack is made upon federal jurisdiction, no presumption of truthfulness attaches to the plaintiffs' jurisdictional allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In a factual attack, the plaintiffs have the burden of proving that federal jurisdiction does in fact exist." *Evans v. Tubbe*, 657 F.2d 661, 663 (5th Cir. 1981). In resolving a factual attack on subject matter jurisdiction under Rule 12(b)(1), the district court, which does not address the merits of the suit,[19] has significant authority "'to weigh the evidence and

---

[19] As the court explained in *Taylor v. Dam*, 244 F. Supp. 2d 747, 753 (S.D. Tex. 2003),

> It is well settled that "a district court has broader power to decide its own right to hear the case than it has when the merits of the case are reached." [*Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.). *cert. denied*, 454 U.S. 897 (1981).] "Jurisdictional issues are for the court--not the jury--to decide,

satisfy itself as to the existence of its power to hear the case.'" *Robinson v. Paulson*, No. H-06-4083, 2008 WL 4692392, *10 (S.D. Tex. Oct. 22, 2008), *quoting Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997), and *citing Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986). The attack here is factual, with KBR submitting substantial documentary evidence supporting its arguments.

A court may *sua sponte* raise a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction at any time. *Westland Oil Development Corp. v. Summit Transp. Co.*, 481 F. Supp. 15 (S.D. Tex. 1979), *aff'd*, 614 F.2d 768 (1980). *See also Kidd v. Southwest Airlines Co.*, 891 F.2d 540, 545 (5th Cir. 1990)("[F]ederal courts must address jurisdictional questions *sua sponte* when the parties' briefs do not bring the issue to the court's attention.").

The Court's dismissal of a case for lack of subject matter jurisdiction is not a judgment on the merits and does not preclude the plaintiff from pursuing his claim in a court that

---

whether they hinge on legal or factual determinations. *Id.* To determine whether jurisdiction exists, the court will generally resolve any factual disputes from the pleadings and the affidavits submitted by the parties. *See Espinoza v. Missouri Pac. R.R. Co.*, 754 F.2d 1247, 1248 n.1 (5th Cir. 1985). The court may also conduct an evidentiary hearing and "may hear conflicting written and oral evidence and decide for itself the factual issues which determine jurisdiction." *Williamson*, 645 F.2d at 413; *see Menchaca v. Chrysler Credit Corp.*,613 F.2d 507, 511-12 (5th Cir.), *cert. denied*, 449 U.S. 953 . . . (1980).

properly has jurisdiction. *Hitt v. City of Pasadena*, 561 F.2d
606, 608 (5th Cir. 1977).

*Rule 12(b)(6)*

When a district court reviews a motion to dismiss
pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the
complaint in favor of the plaintiff and take all well-pleaded
facts as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d
757, 763 (5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603
(5th Cir. 2009). The plaintiff's legal conclusions are not
entitled to the same assumption. *Ashcroft v. Iqbal*, 556 U.S. 662,
678 (2009)("The tenet that a court must accept as true all of the
allegations contained in a complaint is inapplicable to legal
conclusions."), *citing Bell Atlantic Corp. v. Twombly*, 556 U.S.
662, 678 (2007); *Hinojosa v. U.S. Bureau of Prisons*, 506 Fed.
Appx. 280, 283 (5th Cir. Jan. 7, 2012).

"While a complaint attacked by a Rule 12(b)(6) motion to
dismiss does not need detailed factual allegations, . . . a
plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a cause
of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955, 1964-65 (2007)(citations omitted). "Factual
allegations must be enough to raise a right to relief above the
speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller,
*Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed.
2004)("[T]he pleading must contain something more . . . than . .
. a statement of facts that merely creates a suspicion [of] a

legally cognizable right of action"). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*,556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974). "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard is not akin to a "probability requirement," but asks for more than a "possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556. Dismissal is appropriate when the plaintiff fails to allege "'enough facts to state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'" *Montoya*, 614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.

In *Ashcroft v. Iqbal*, 556 U.S. at 679, the Supreme Court stated that "only a complaint that states a plausible claim for relief survives a motion to dismiss," a determination involving "a

context-specific task that requires the reviewing court to draw on its judicial experience and common sense." "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b). *Iqbal*, 129 S. Ct. at 1949. The plaintiff must plead specific facts, not merely conclusory allegations, to avoid dismissal. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief . . . ." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. *Great Plains Trust Co v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)("District courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004)("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion. [citations omitted]"). The court should deny leave to amend if it determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally

insufficient on its face . . . ."  6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Proc.* § 1487 (2d ed. 1990).

**KBR's Motion to Dismiss (#4, and Supporting Memorandum, #5)**

Interwoven with the arguments addressed regarding the motion to remand, KBR's motion to dismiss asserts three distinct reasons to dismiss all KPCC's claims:  (1) KBR is entitled to derivative sovereign immunity because it acted in accordance with express contractual directions from the United States; (2) under Rule 12(b)(1) the Court lacks subject matter jurisdiction because it cannot review the merits of Plaintiff's claims or KBR's defenses without addressing nonjusticiable political questions[20]; and (3) under Rule 12(b)(6) KPCC fails to state a claim upon which relief may be granted  because adjudication of KPCC's claims would require the Court to invalidate sovereign acts of state by the Republic of Iraq.[21]

KBR describes in detail with supporting documentary evidence the specific instructions the United States Government continually gave to KBR, and which KBR followed, regarding the

_____

[20] These "foreign policy determinations and discretionary decisions by executive branch officials in a war theater" include "(1) the propriety of the terms negotiated and agreed to between the United States and the newly established government of Iraq in 2008; (2) the U.S. military's subsequent interpretation and application of those terms to the DFAC at issue in this lawsuit." #5 at p.2.

[21] KPCC's "allegations implicitly but necessarily contest Iraq's ownership rights to the DFAC under the terms of the 2008 agreement with the United States.  KPCC cannot prevail against KBR without first establishing that Iraq's ownership interst in DFAC is illegitimate."  #5 at p.2.

DFAC and the decision ultimately to not purchase it because ownership rested with the sovereign Government of Iraq under the Security Agreement, the provisions of which emphasized that sovereignty. #5 at 3-8. Citing relevant cases, KBR therefore argues that KPCC's claims should be dismissed under Rule 12(b)(1) because KBR is entitled to derivative sovereign immunity for actions it took regarding the DFAC at the specific direction in written documents from the United States Government. *See, e.g., Yearsley*, 309 U.S. 18; *Ackerson*, 589 F.3d 196; *Mangold v. Analytical Servs., Inc.*, 77 F.3d 1442, 1337-48 (4ᵗʰ Cir. 1996)("If absolute immunity protects a particular governmental function, no matter how many times or to what level that function is delegated, it is a small step to protect that function when delegated to private contractors, particularly in light of the government's unquestioned need to delegate governmental functions."); *Murray v. Northrup Grumman Info. Tech., Inc.*, 444 F.3d 169, 175 (2d Cir. 2006)(holding that a private contractor hired to perform a "quintessential governmental function" is absolutely immune from liability under state law for actions taken in the course of its official duties). Here the challenged conduct was well within the scope of KBR's official duties under a validly conferred federal contract, as KPCC's petition concedes.

KBR further contends KPCC's claims should also be dismissed again under Rule 12(b)(1) because they raise nonjusticiable political questions. *Baker v. Carr*, 369 U.S. 186. Addressing KPCC's claims would require the Court to inquire into the reasonableness of the United States' foreign policy decisions

regarding the normalization of relations with a foreign sovereign after a long period of armed conflict.   Such matters are undisputedly committed to the executive and legislative branches of the United States Government and thus not subject to judicial review.

### KPCC's Response (#13)

Reiterating its previous arguments that the Security Agreement between the United States and Iraq was signed on September 17, 2008 and thus was in effect long before the subcontract in dispute between KBR and KPCC was signed in September 2010.   The Security Agreement does not reference FOB Warrior (C7) nor list it as an "agreed facility."   KPCC now highlights the fact that under Security Agreement's express terms, the list of agreed facilities had to be turned over to Iraq upon entry of the Security Agreement in 2008 and all property subject to the Security Agreement had to be turned over to Iraq by June 2009.  #13, Ex. 6.  KPCC argues that FOB Warrior (C7) could not have been a part of the Security Agreement because it if were, KBR could not have contracted with KPCC to construct the dining facility on it in 2010.  Therefore this case does not question the validity or policy reasons for the Security Agreement, which is irrelevant to the issues in this suit.  Moreover, as indicated earlier, the second subcontract, Ex. 1 at ¶ 4.5.2, states that the contractor may "at its sole discretion at any time during the lease, unilaterally opt to purchase the Assets."  KPCC emphasizes that nothing in the subcontract makes performance or purchase of the facility contingent upon approval by the United States

Government.  While ¶ 6.1.1 gave KBR the right to assign the use of
the property to the United States Government, KBR did not do so.
KPCC summarizes, "In this case KBR contracted to lease and then
purchase a dining facility that was erected by KPCC.  KBR leased
the facility and when the time came to pay the remaining purchase
price, it refused to pay.  That is a breach of contract."  #13 at
p.9.  KBR both refused to pay for the facility and refused to
allow KPCC to pick it up, a second breach of the contract.
Instead KBR kept using the facility, but failed to pay for it,
again breaching the contract.

        KPCC contends that derivative sovereign immunity does
not apply here because it is suing KBR under KBR's own contract
for its own decision in its "sole discretion" not to purchase or
return the facility, and therefore KBR can be held accountable for
its decision.[22]    KPCC maintains that KBR was an independent

---

[22] The Court earlier ruled that Texas law, and therefore
the Texas Supreme Court's opinion in *Brown & Gay*, which addressed
state law concepts of derivative sovereign immunity, and not the
common law principles addressed by the Fifth Circuit in *Yearsley*
and *Ackerson*, does not control in this suit.
        Moreover, KBR points out that its motion to dismiss
relies on the derivative sovereign immunity principles in
*Yearsley*, 309 U.S. at 22 (holding that liability for loss of
property caused by a contractor acting at the direction of the
federal government rests only with the government, not the
contractor), and *Ackerson*, 589 F.3d at 207 (holding that a
contractor acting at the federal government's direction cannot be
held liable for damages caused by the government's instructions)
that a contractor performing its duties within the scope of a
federal government contract is immune from third-party liability
allegedly arising from that performance.    Nevertheless KPCC
ignores KBR's reliance on these two cases and applies the Texas
Supreme Court's opinion in *Brown & Gray.*  KBR highlights the fact
that *Brown & Gray,* itself, distinguishes its facts from the
results in *Yearsley* and *Ackerson,* where there was no diversion
from the government's instructions and where "the alleged cause of
the injury was not the independent action of the contractor, but

contractor of the United States Government, not a common law agent.   Furthermore, KPCC asserts, when the Government does business with a third party, it waives sovereign immunity. *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002)("Once the United States waives its immunity and does business with its citizens, it does so much as a party never cloaked with immunity.").   "'When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'" *Id., quoting Mobile Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 607 (2000).   If the United States waives its sovereign immunity, KBR waives its derivative sovereign immunity, too.   KPCC further asserts that derivative sovereign immunity under federal law is simply a product of common law, applies only to tort actions and does not apply to contract actions.   *See Bixby v. KBR, Inc.*, 748 F. Supp. 2d 1224, 1242 (D. Or. 2010).

Furthermore, argues KPCC, immunity "must be affirmatively justified, and does not flow automatically from the government's retained sovereign immunity." *McMahon*, 502 F.3d at 1345-56.   It maintains that KBR has not given reasons nor

---

the action taken by the government *through* the contractor." Response, Ex. 5 at p.13. In the case before this Court KPCC does not claim that KBR acted negligently or deviated at all from the instructions and direction of the United States, and in fact could not in light of the contemporaneous documentary evidence submitted by KBR; instead KPCC charges that KBR made the wrong decision in obeying those directions and should have let KPCC remove the DFAC from FOB Warrior (C7) or KBR should have purchased the property from KPCC despite the military's determination that it was not KPCC's property to sell.  #18 at p.6.

presented any evidence justifying an extension of sovereign immunity to itself.

KPCC also insists there are no political questions involved regarding the legitimacy of the Security Agreement nor the decision of the United States Government in entering into it. Nor will the Court be reviewing a political decision made by another branch of government. The issue of this case is not the validity of the Security Agreement, but whether KBR breached its subcontract with KPCC. KBR is seeking only damages for that breach and/or for fraudulently inducing KPCC into the contract, but not injunctive relief or a declaration that the Security Agreement is void or voidable. KPCC claims without authority that a lawsuit only for damages "is typically free from any political question." #13 at p.15.

KPCC further contends that KBR has repeatedly tried to argue the existence of a political question in tort cases filed against it for various illegal acts in Iraq and Afghanistan. For example, in *Bixby v. KBR*, a plaintiff class sued KBR for exposure to toxic chemicals (sodium dichromate and resultant hexavalent chromium) while members were stationed in Iraq and on duty at the Qarmat Ali water plant. KBR lost on its claim for derivative sovereign immunity. The court also held that the political question doctrine does not preclude jurisdiction where a government contractor is being sued for the performance of a government contract, particularly when the contractor is permitted any measure of discretion. *Bixby v. KBR, Inc.*, 748 F. Supp. 2d

at 1239-40.[23]  *Bixby* cites several cases involving KBR in which the court rejected KBR's argument that the political question doctrine precluded jurisdiction, including *Lane v. Halliburton*, 529 F.3d 548, 554 (5th Cir. 2008).  In *Lane*, in which Halliburton employees sued KBR in tort for injuries they suffered when their truck was attacked by Iraqi insurgents, the Fifth Circuit went through the six *Baker* factors and, disagreeing with the district court, concluded none of them was present.[24]  In particular it found that KBR's decisions were not political because KBR "is not part of any

_____

[23] This Court observes that the soldiers' claims against KBR in *Bixby* were state law claims for negligence and fraud.

[24] KBR later responds (#18 at p. 10 n.2.) by noting that in *Lane*, 529 F.3d at 568, the Fifth Circuit in its conclusion wrote,

> We recognize the difficulty presented by cases that arise at least in part in a war zone.  There are constitutional as well as practice considerations that may prevent judicial resolution.  It appears, though, that these tort-based claims of civilian employees against their civilian employers can be separated from the political questions that loom so large in the background. . . .  It is conceivable that further development of the facts on remand will again send this case toward the political question barrier.  Permitting this matter to proceed now does not preclude the possibility that the district court will again need to decide whether a political question inextricably arises in this suit.

KBR points out that it ultimately prevailed in this litigation on other grounds, i.e., preemption by the Defense Base Act, 42 U.S.C. § 1651, but that the Fifth Circuit continued to recognize the potential application of the political question doctrine although because of this preemption it chose "not to consider whether we have jurisdiction to entertain [KBR's] alternative grounds" of political question, government contractor defense and combatant activities exception.  *Fisher v. Halliburton*, 667 F.3d 602, 606 (5th Cir. 2012).

coordinate branch of the federal government" and "[t]he court will be asked to judge KBR's policies and actions, not those of the military or Executive Branch."  529 F.3d at 560, 563.  KPCC argues that in this case this Court will be asked to question KBR's actions and its decision to pay or not to pay for the facility in its sole discretion.

KPCC, citing examples (# 13 at p.17 n.3) notes that while KBR can sue the United States Government under LOGCAP III and LOGCAP IV, KPCC has no contractual privity with the United States Government and cannot do so.[25]  Moreover, there was no obstacle to KBR's paying KPCC and then challenging the Government. If KBR wanted its contractual obligations to be contingent on the Government's approval, it could have stated so in the contract, but did not.

Finally and alternatively, if the Court decides that the political question and act of state doctrines do not apply to this case, if therefore that FOB Warrior (C7) was one of the agreed facilities in the Security Agreement, and if that fact was known in November 2008 when the Security Agreement was executed or at latest in June 2009 when all agreed upon property was turned over to Iraq, then KPCC has a claim for promissory estoppel and/or fraud.  In the second subcontract entered into in September 2010, KBR represented that it would pay rent to KPCC for a set time or would purchase the Facility, and KPCC relied on that representation when it built the Facility at FOB Warrior (C7).  If

---

[25] This Court observes that a contract is not required for a takings claim under the Fifth Amendment.

the Facility is subject to the Security Agreement, KBR knew or should have known that any building erected on the site would immediately become property of the Iraqi Government.   Therefore KBR was either without authority to execute the second subcontract and it is void or it was the product of fraudulent inducement or it fails for lack of mutuality, and KPCC is entitled to recover out-of-pocket damages for its reliance on KBR's representations.[26]

In sum, KPCC highlights that this is a breach of contract case.  KBR voluntarily entered into these commitments and thus waived any potential claim of immunity.   It entered into the second subcontract two years after the Security Agreement and is now attempting to use it to avoid its obligations in an unjustified use of the doctrines raised in its defenses.

### KBR's Reply (#18)

KBR first argues that KPCC's claims against KBR are barred by derivative sovereign immunity.

KBR reiterates much of what it summarized about Potter's numerous, ongoing, specific directions, the government's decisions, and KBR's compliance with them, supported by Potter's declaration, emails and a November 1, 2011 memorandum, asserted regarding the motion to remand.  It now contends, "The instant

---

[26]  KBR disagrees with this assertion and with KPCC's claim of fraudulent inducement and points out that the Security Agreement does not mention by name any specific facility to be transferred, including the FOB Warrior DFAC.  It was only in late 2011, during the closing months of the United States' military presence in Iraq, and long after performance pursuant to the second subcontract had begun, that the United States determined that the FOB Warrior DFAC fell within the terms of the Security Agreement and was thus the property of Iraq.  #18 at p.14 n.6.

lawsuit, despite KPCC's protestations to the contrary, is at its core a challenge to the government's 2011 designation of the FOB Warrior DFAC as Iraqi government property. . . . The government's decision undeniably constitutes a military and foreign policy judgment regarding the proper application of the Security Agreement and was made in furtherance of the United States military's previous determination that 'an effective transfer of functional facilities [in Iraq] is critical to enabling our Iraqi partners to assume increased security responsibility.'"  #18 at p.2, citing Memorandum re:   Return of Closure of Bases and Facilities, issued by Raymond T. Odierno, Commanding General, Multi-National Force--Iraq (Apr. 20, 2009)(Ex. 2).  KPCC not only disagrees with the military's decision and fails to recover from the Government for a taking of its property, but KPCC also wants to hold KBR "liable, as a surrogate for the United States, for obeying the military's directives.   As such, KPCC's lawsuit against KBR runs afoul of derivative sovereign immunity principles, the political question doctrine, and the act of state doctrine, and should be dismissed on one or more of these grounds." *Id.* at pp. 2-3.

        While KPCC complains that KBR is being sued under its own contract and for its own decision not to purchase or return the [DFAC]" (Response at 10), § 4.4.2 of the subcontract said the decision whether to purchase was in KBR's "sole discretion."  So by itself the decision not to purchase, whether made independently by KBR or pursuant to directions from the United States, cannot constitute a breach of contract.

KBR maintains that KPCC's "real" claim is for loss of its ownership interest in the FOB Warrior DFAC, the value of which KPCC seeks to recover from KBR as damages. Response at p.8. KBR emphasizes that the decision to designate the DFAC as Iraqi government property was undisputedly made by the military, not by KBR. Potter's declaration (#Ex. 1 to #18, ¶¶3 and 5) states that "the United States used private contractors and subcontractors to provide a variety of essential logistical support services," one of which was KBR, and "[w]ith the approval of the United States, KBR used subcontractors to support DFAC food service operations and operational facilities, including the DFAC at FOB Warrior."

KPCC argues that KBR could have allowed KPCC to remove the DFAC from FOB Warrior or could have purchased the property from KPCC despite the military's determination that it was not KPCC's property to sell because the subcontract gave it the "sole discretion" to do so. KBR points out that the actual language of ¶ 4.5.2 of the subcontract does not say that; instead it states that KBR "may, at its sole discretion at any time during the lease, unilaterally opt to purchase the [DFAC]. . . . Nothing in this SUBCONTRACT shall obligate [KBR] to exercise this option." Nor does the subcontract authorize or require KBR to disregard the decisions of the United States, which the subcontract identifies as the ultimate "Owner" of and "Client" for the work being performed. It further states in ¶ 6.1.1 that "the right to use any piece of real estate, buildings or property being possessed and/or controlled by the [United States] is given to [KBR] by the [United States] and the right to sue can be revoked by the [United

States] at any time." *See also* KPCC's response, Ex. 1 at p.4 ("No legal liability on the part of [KBR] for any payment [to KPCC] may arise until . . . funds are made available [by the United States].").

KPCC also contends that derivative sovereign immunity cannot apply to breach of contract actions because it is a common law extension of the Federal Tort Claims Act. Response at pp. 11-12. KBR points out that *Yearsley* was issued by the Supreme Court in 1940, six years before Congress passed the Federal Tort Claims Act.

In response to KPCC's assertion that "if the [United States Government] waives its sovereign immunity when it contracts with private parties, so, too, does KBR" (Response at p. 11), KBR insists that KPCC has not identified anything that suggests that the United states waived its sovereign immunity for such inherently governmental functions such as negotiation and entering into a Security Agreement with the government of Iraq nor its later decision to hand over the FOB Warrior DFAC to Iraq, nor that KBR agreed to assume liability for the losses arising from such sovereign acts. *Filarsky*, 132 S. Ct. at 1666 (recognizing that derivative sovereign immunity protects non-governmental actors from being "left holding the bag--facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity.").

In sum, argues KBR, the foreign policy and military decisions of the United States are out of KBR's control, and derivative sovereign immunity bars KPCC from holding KBR liable

for the consequences of those governmental decisions. *Yearsley*,
309 U.S. at 22 ("In the case of a taking by the Government of
private property for public use . . . the remedy to obtain
compensation from the Government is as comprehensive as the
requirement of the Constitution, and hence it excludes liability
of the Government's representatives lawfully acting on its behalf
in relation to the taking.").

          Second, KBR reiterates that KPCC's claims challenge
foreign policy and military decisions and thus raise
nonjusticiable political questions warranting their dismissal.
KPCC's two main arguments against the application of the political
question doctrine are contrary to the law:  (1) that "when a
plaintiff seeks only damages, the lawsuit is typically free from
any political question" (Response at 15); and (2) that the
question of this case is not the validity of the Security
Agreement, but whether KBR reached its contract with KPCC
(Response at 14).  KBR cites a number of cases seeking damages
that were dismissed based on the political question doctrine.  #18
at pp.9-10.  Regarding the second argument, KBR has shown that not
only the terms of the Security Agreement are at issue, but also
the United States military's subsequent interpretation and
application of those terms to the DFAC in dispute.  Not only has
KPCC admitted that this case will require the Court to determine
if the FOB Warrior DFAC falls within the terms of the Security
Agreement, but the military, as part of its discretionary
withdrawal of United States troops from Iraq, determined that it
did.  The political question doctrine is intended to bar just such

judicial second guessing in this litigation. *Taylor v. KBR*, 658
F.3d 402, 411-12 (4th Cir. 2011)("[T]he district court correctly
concluded that a decision on the merits of Taylor's negligence
claim would require the judiciary to question 'actual, sensitive
judgments made by the military[,] . . . whether . . . the Marines
made a reasonable decision . . . . [S]uch an assessment . . . is
beyond the scope or judicial review.   In these circumstances,
therefore, the political question doctrine deprived the district
court of jurisdiction to adjudicate the merits of Taylor's
negligence claim.").   KBR observes that in *Taylor* the Fourth
Circuit rejected the claim made in this case by KPCC that the
political question doctrine does not apply where a contractor has
partial or even substantial discretion about how it carries out
its obligations; instead the Fourth Circuit concluded that a case
may raise political questions even where the contractor, which was
also KBR in that case, is "nearly insulated from direct military
control and was itself solely responsible for the safety of all
'camp residents during all contractor operations,'" because the
issue is not whether the contractor has discretion but whether the
case "will require the judiciary to question actual, sensitive
judgments made by the military[,]" i.e., "whether . . . the
Marines made a reasonable decision." *Taylor*, 658 F.3d at 411.
KBR insists that the governmental decision making about the
application of the Security Agreement to the DFAC is "inextricably
intertwined with the merits of KPCC's case against KBR." #18 at
p.10.   This Court agrees.

KBR rejects KPCC's attempt to define this lawsuit as a simple breach of contract action and insists that it cannot be separated from the integral involvement of the United States Government and the military's determination that it was "imperative that we set the conditions for the [Government of Iraq] and the ISF to effectively assume security responsibility and build stability in Iraq."  #18, Ex. 2, Memorandum from Gen. Odierno regarding Return or Closure of Bases and Facilities.  Part of that process was the return to Iraq of the FOB Warrior DFAC. Potter's declaration demonstrates that the military only made the decision regarding the DFAC after substantial review and consultation with the USF-1 command structure.  To prevail in this case, KPCC must challenge the military's 2011 determination and thereby require discovery from the numerous civilian and military personnel involved in the transition and raise the potentiality of embarrassment from conflicting pronouncements by various governmental entities and employees regarding the propriety of the terms and conditions under which the United States military forces withdrew from Iraq.  *See Martin v. Halliburton*, 618 F.3d 476, 488 (5th Cir. 2010)("Because the basis for [the political question doctrine and other immunity and preemption defenses] is respect for the interests of the Government in military matters, district courts should take care to develop and resolve such defenses at an early stage while avoiding, to the extent possible, any interference with military prerogatives.").

Finally KBR reiterates that the act of state doctrine also prevents KPCC from challenging the transfer of ownership

interest in the DFAC to the Government of Iraq and Iraq's current ownership of it. *W.S. Kirkptrick*, 493 U.S. at 404; *Banco Nacional de Cuba*, 376 U.S. at 421-37.

### Court's Decision

This Court agrees with KBR that KPCC views this case far too narrowly, in essence cutting the breach of contract and fraud in the inducement claims completely out of their highly relevant and influential context, which is vital to evaluating KPCC's claims and understanding the relevance, significance, and force of KBR's defenses.

For the reasons delineated above, the Court

ORDERS that KPCC's motion to remand is DENIED.

As noted, if a complaint could be dismissed for both lack of jurisdiction and for failure to state a claim, "the court should dismiss only on the jurisdictional ground under [Rule] 12(b)(1), without reaching the question of failure to state a claim under [Rule] 12(b)(6)." *Crenshaw-Logal*, 2011 WL 3363872, *1, quoting Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977). Moreover, because dismissal of a case for lack of subject matter jurisdiction is not a judgment on the merits and is without prejudice, it would not preclude KPCC from pursuing a takings claim or other remedy against the United States in the Court of Claims. *Hitt*, 561 F.2d at 608.

The Court agrees with KBR that the government contract defense, the political question doctrine, the DPA, and the act of state doctrine all apply under the facts here to preclude the Court from ruling on the issues in this case. Nevertheless, only

the political question doctrine, in which the act of state doctrine is grounded according to the Fifth Circuit,[27] deprives the Court of subject matter jurisdiction so as to trigger application of Rule 12(b)(1).  As indicated earlier, the Fifth Circuit has concluded that the government contractor defense is not jurisdictional; therefore claims that fall under its rubric cannot be dismissed under Rule 12(b)(1).  *See also Ackerson*, 589 F.3d at 207-08 ("*Yearsley* itself countenances against its application to deprive the federal court of jurisdiction. *Yearsley* does not discuss sovereign immunity or otherwise address the court's power to hear the case. . . . Based on the Supreme Court's actions in *Yearsley*, we hold that concluding *Yearsley* is applicable does not deny the court of subject-matter jurisdiction.").  The Defense Production Act, like the federal contractor defense, provides federal contractors with a federal defense of immunity from liability.  *Hercules, Inc. v. United States*, 516 U.S. 417, 429 (1996); *Martin v. Halliburton*, 618 F.3d 476, 485 (5th Cir. 2010).

Accordingly, the Court

---

[27] *Occidental of Umm al Qaywayn*, 577 F.2d at 1204-05.

ORDERS that this case is DISMISSED without prejudice under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction based on the political question and act of state doctrines.

**SIGNED** at Houston, Texas, this  31st  day of   March  , 2016.

                                                    MELINDA HARMON
                                          UNITED STATES DISTRICT JUDGE